SHARP, Assignee, *v.* PHILADELPHIA WAREHOUSE Co.*

(*Circuit Court, E. D. Pennsylvania.* October 25, 1881.)

1. PREFERENCE—CONSIDERATION—COMPOUNDING MISDEMEANOR AFFECTING PUBLIC INTERESTS.

    An agreement by a creditor not to prosecute a debtor for a misdemeanor affecting public interests is an illegal consideration, and, as against the debtor's assignee in bankruptcy, will not support a transfer of the debtor's property to the creditor received with knowledge of the debtor's insolvency.

Hearing on Bill, Answer, and Proof.

The material facts of the case, as shown by the evidence, were as follows:

*Reported by Albert B. Guilbert, Esq., of the Philadelphia bar.

The firm of E. & C. Stokes failed on January 18, 1878. For a number of years they had received goods on storage from various persons, and had issued warehouse receipts therefor. At the time of their failure the Philadelphia Warehouse Company held a number of these warehouse receipts, on which it had made large advances. Learning of the failure, the warehouse company sent to E. & C. Stokes' store, and finding that there were large deficiencies in the pledged goods, threatened E. & C. Stokes with a criminal prosecution under the "warehouse act."* On the next day a gentleman by the name of German Smith called upon the president of the warehouse company. He represented himself as a friend of E. & C. Stokes, and asked what could be done to avoid the criminal prosecution. The president replied that if the company could be paid or secured $10,000, which was less than the amount of the deficiency, he would recommend the company not to prosecute. The next day German Smith called with Mr. Elton, the father-in-law of E. Stokes. Smith offered to ship the company 150 bags of sumac in settlement. This offer was declined, but finally the company accepted a judgment bond for $10,-000, signed by Elton and Smith, with the understanding that Smith should give the company 30 tons of sumac then in Philadelphia, and should ship them 90 tons more; that the proceeds of this sumac should be credited on the bond; and that his liability should then cease. The company on its part agreed not to institute criminal proceedings. The company received the 30 tons of sumac, and sold 10 of it, realizing $470.28. Subsequently it received and stored the remaining 90 tons, and still later, upon Mr. Elton making payment of the bond, it transferred the sumac to him, giving him credit for the 10 tons sold. Meanwhile, in February, 1878, E. & C. Stokes, upon the petition of creditors, were adjudicated bankrupts. It then transpired that German Smith was their debtor, and that the sumac shipped by him was shipped in payment of their claim. The warehouse company learned of this fact after they had received but 30 tons of the sumac, and before the remaining 90 tons had been shipped. The assignee in bankruptcy filed this bill to recover from the warehouse company the value of all the sumac received.

*R. L. Ashhurst* and *Samuel S. Hollingsworth,* for complainant.

*George Junkin,* for respondent.

BUTLER, D. J. The plaintiff seeks to recover from defendants the value of 150 tons of sumac, received by the latter from German

---

*The Pennsylvania act of assembly of twenty-fourth of September, 1866, § 2, provides that no receipt or voucher for any goods shall be given by any person, unless the goods shall be in his possession and under his control.

Sec. 4. The maker of such receipt or voucher shall not sell, encumber, ship, transfer, or in any manner remove beyond his immediate control the goods or property, without the return of the receipt or voucher therefor.

Section 5 enacts that any person violating the act shall be deemed guilty of fraud, and upon conviction be fined and imprisoned.

Section 108 of the act thirty-first of March, 1860, provides that any bailee of property, who shall fraudulently take or convert the same to his own use, or to the use of any person other than the owner, shall be guilty of larceny, and punished as in cases of larceny of like property.

Section 9 enacts that any person, having a knowledge of the actual commission of larceny, who shall take money or other reward, or promise thereof, to compound the crime aforesaid, he shall be guilty of a misdemeanor, and on conviction be fined and imprisoned.

Smith,—which the plaintiff alleges were delivered by Smith in pursuance of an agreement between himself, (Smith,) the Messrs. Stokes, (who were insolvent,) and the defendants,—in discharge of Smith's indebtedness to the Stokes, on account of the latter's indebtedness to the defendants,—and consequently in fraud of the bankrupt laws.

To sustain the allegation of fraud, it must appear that the defendants had knowledge that the sumac belonged to Stokes, or was furnished in payment of indebtedness to them, with their consent, and that the defendants were aware of their financial condition. Of the latter fact, there is no doubt; the defendants concede that they were aware of Stokes' insolvency, at the outset of the transaction. It does not appear, however, that they were aware at that time of Smith's indebtedness to Stokes, and that the sumac was furnished on their account, in discharge of his indebtedness to them. We believe they were not aware of this, at the outset, nor until 60 tons had been furnished. They had reason to believe, and we think did believe, that Smith was contributing his own property to relieve his friends,—for whose welfare he manifested great solicitude,—without being under any pecuniary obligation to them. In this, however, the defendants were mistaken. Smith was indebted to Stokes in a considerable sum, and by arrangement with them undertook to furnish the sumac in discharge of this indebtedness. The defendants having received the 60 tons in igorance of these facts, are not liable to the charge of fraud, preferred against them, as respects it. After this, however, and before more had been shipped, they were fully informed of the circumstances, just adverted to. The balance was, therefore, received with knowledge that it was delivered in discharge of Smith's indebtedness to Stokes, and in reduction of the latter's assets, to that extent. Nevertheless, if the defendants, at the outset of the transaction, (while ignorant of the relation between Smith and Stokes,) acquired a right to the sumac, or its delivery, (as upon contract for valuable consideration, with Smith, as owner,) the subsequent knowledge referred to, would not affect the right, but be wholly immaterial. They had contracted for it with Smith, whom they believed to be the owner, and had taken his bond,—in part payment of which the sumac was to be furnished. If this contract was valid in law, the defendants had acquired an interest in the sumac, and a right to demand its delivery, before they were informed of the relations between Smith and Stokes. The case thus turns, as respects

the 90 tons, on the validity of the contract with Smith. The only consideration for this, as the defendants admit, was an agreement on their part not to prosecute Stokes for a crime which they had committed, or were charged with committing. This crime consisted in clandestinely abstracting property deposited with them as warehousemen, and applying it to their own use,—for which they were liable to prosecution under the fifth section of the Pennsylvania statute of September 24, 1866, if not also under the 108th section of that of 1860. The crime defined by the first of these statutes is a misdemeanor, while that defined by the last is a felony. It is not essential to determine whether Stokes might have been prosecuted under the latter statute, inasmuch as the misdemeanor here involved (if the offence be no more) is of such a character—so seriously affects the public interests—that an agreement not to prosecute cannot be regarded as a consideration for a promise to pay money, or deliver goods. While misdemeanors of a private character, affecting individuals principally, may be compounded, and an obligation taken for restitution of property obtained, or payment of damages suffered, may be enforced, public policy forbids that misdemeanors which seriously affect the public welfare, shall thus be disposed of. Conceding the offence charged against Stokes to have been a misdemeanor merely, it was, we repeat, a very serious one to the community. They were engaged in an important public employment, involving and inviting trust and confidence,—an employment regulated by statute, and intimately connected with commerce. The compounding of offences committed by persons engaged in such employment would seriously tend to imperil the public interests. While strongly inclining to the belief that Stokes were liable to prosecution under the act of 1860, it is sufficient for the purposes of this case to say that the defendants' promise not to prosecute, even if the crime was limited to that prescribed by the statute of 1866, afforded no lawful consideration for Smith's promise to deliver the sumac. It follows that the defendants had acquired no interest in the sumac, undelivered, or right to demand it, at the time of receiving information of Smith's relations to Stokes; and receiving it afterwards with knowledge that it was being furnished in payment of the former's indebtedness to the latter, the transaction must be treated as a preferential payment by Stokes to them (the defendants) through Smith.

It is of no consequence that the defendants subsequently transferred

the sumac to Mr. Elton, who united with Mr. Smith in the bond—leaving him to apply it to the joint obligation. The defendants could dispose of it as they saw fit, and did so.

They must be held accountable for the net proceeds of the 90 tons received under the circumstances stated.

McKENNAN, C. J., concurred.